Filed 2/6/24  P. v. Marquez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B321529 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA080805-01) |
| v. | |
| WILLIAM ALEXANDER MARQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Honorable Lisa M. Strassner, Judge.  Affirmed.

Robert H. Derham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

After William Marquez's car was rear ended by another car, Marquez drove away at very high speed, went through a red light, and hit another car, killing the two occupants. A jury convicted him of two counts of murder (Pen. Code,[1] § 187), two counts of vehicular manslaughter (§ 192, subd. (c)(1)), felony hit-and-run driving resulting in death (Veh. Code, § 20001, subd. (b)(2)) and misdemeanor hit-and-run driving resulting in property damage (Veh. Code, § 20002, subd. (a)). The trial court sentenced appellant to consecutive terms of 15 years to life for the two murder convictions.

Appellant appeals from the judgment of conviction, contending the trial court erred in instructing the jury with CALJIC No. 2.62, which tells the jury when adverse inferences may be drawn from a testifying defendant's failure to deny or explain adverse evidence. He also contends the trial court abused its discretion in imposing consecutive sentences for the two murder convictions. We affirm the judgment of conviction.

## BACKGROUND

About 10:00 p.m. on January 30, 2021, Brendan Word-Gonzales (Word) was driving his Toyota Celica on Avenue P in Palmdale when he noticed a black Chrysler 200 driving erratically. Word's friend Tony Lopez, who was driving another car, also noticed the Chrysler's driving; Lopez stated the car was being driven "aggressively" and cutting in and out of lanes. Lopez was able to see the driver's face and identified the driver as appellant. The Chrysler was registered to appellant.

---

[1] Undesignated statutory references are to the Penal Code.

2

At some point, the driver of the Chrysler cut in front of Word's car and slammed on the brakes. Word honked. The second time the Chrysler braked abruptly, Word's car hit the Chrysler in the rear. Word's car could not be driven after the collision. The Chrysler drove away, a lot faster than normal.

Lopez saw the collision and followed the Chrysler to try to get its license plate number. The Chrysler turned onto 10th Street and Lopez followed. The Chrysler's data recorder showed it was traveling 80 to 85 miles per hour seconds before the car reached Avenue O-8. Lopez saw the Chrysler drive though a red light at Avenue O-8 and hit a Honda Civic which had entered the intersection from Avenue O-8. As Lopez got closer to the intersection, he saw someone running away, but he was too far away to identify the person.

Andreea Fernandez was waiting in her car to make a left turn from Avenue O-8 onto 10th Street. She had a red arrow but the through traffic on Avenue O-8 had a green light. She saw the Chrysler enter the intersection and hit the Honda. She stopped behind the Chrysler and called 911. She saw a man standing by the driver's side door of the Chrysler. The man was wearing a COVID face mask, and she could not identify him. She asked him if it was his car, and he replied that it was. He asked to use her phone, but she refused because she was speaking with 911 operators. At some point, she noticed the man had left.

The two men in the Honda died of their injuries at the scene of the crash.

Los Angeles County Deputy Sheriff James Conley responded to the scene of the collision. He observed several empty cans and bottles of beer in the Chrysler. He also discovered a beer can that was cold to the touch and more than

3

half full.  DNA from blood drops on one of the deployed airbags in the Chrysler was later determined to match appellant's DNA.

Sheriff's deputies went to appellant's home.  His sister-in-law, Maria Monroy, told the deputies appellant was not home.  The deputies asked Monroy to call appellant.  Appellant's mother called appellant, with the speaker on.  A male voice answered and Monroy asked, "Are you okay?"  The voice replied, "I fucked up.  I was involved in an accident."  Appellant's mother turned off the speaker and began speaking to appellant in Spanish.  The deputies heard the word "policia" and then the call ended.  The deputies called the number back, but it went to voicemail.

Deputies looked for appellant over the next few days without success.  Appellant turned himself in on February 5, 2021, one week after the accident.

Appellant testified in his own defense at trial.  He described three violent incidents in his life which made him anxious in crowds, easily startled, hypervigilant of danger, and insecure.[2]

Appellant stated that on the day of the collision, a black car and a silver car were harassing him as he drove down Avenue P.  They drove side-by-side so that he could not pass them.  They repeatedly slowed down and sped up.  The black car drove away

---

[2]      This first occurred when he was 20 years old and someone in a car fired at him while he was walking down a street.  The second occurred several years before the collision when a girlfriend's former boyfriend stabbed him multiple times with a large kitchen knife.  Appellant spent almost a month in the hospital as a result.  The third occurred about a year before the collision when appellant was struck by a car while crossing the street.

4

at a traffic light, and appellant was able to pass the silver car. That car then began to tailgate him. When appellant slowed down to turn at 10th Street, the silver car hit the rear of appellant's car. The black car had reappeared and appellant did not feel safe stopping, so he drove down 10th Street intending to pull into a parking lot.

The black car followed him closely. Appellant stopped at a red light and saw the black car right behind him. Appellant was afraid and drove through the red light (without hitting anyone). The black car followed and appellant sped up. The black car sped up too. It followed appellant very closely; the car's very bright headlights blinded him. Appellant saw green lights ahead of him and did not see a red light. He did not intend to run a red light. When he saw the other car in the intersection, he braked hard and swerved.

After the collision, he was in shock. He was afraid of the man in the black car and so he ran. He went to a friend's shop and spent the night there. At some point, he learned that two people had died in the collision. He began contacting lawyers. He found a lawyer who arranged his surrender to the police.

Appellant denied drinking the night of the crash. He said the beer bottles and cans belonged to his brother, Julio Marquez. Julio Marquez testified he left some beer cans in appellant's car on the night of the collision. Marquez brought the beer cans into the car when appellant gave him a ride to a party. On the way to the party, they stopped and Marquez bought bottles of beer. Marquez testified appellant did not drink in the car or at the party when he dropped off Marquez.

# DISCUSSION

## A.     *Any Error in Giving CALJIC No. 2.62 Was Harmless.*

Although not requested to do so by either of the parties, the trial court instructed the jury with CALJIC No. 2.62, which explains when adverse inferences may be drawn from a defendant's testimony.  The trial court did not state what evidence supported the instruction and neither party objected.  Appellant contends the court erred prejudicially in giving the instruction.  The People contend there was evidence to support this instruction and any error was harmless.  We agree it was error to give the instruction but find the error harmless.

CALJIC No. 2.62, as given, read as follows: "In this case defendant has testified to certain matters. [¶] If you find that the defendant failed to explain or deny any evidence against him introduced by the prosecution which he can reasonably be expected to deny or explain because of facts within his knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. [¶] The failure of a defendant to deny or explain evidence against him does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. [¶] If a defendant does not have the knowledge that he would need to deny or to explain evidence against him, it would be unreasonable to draw an inference unfavorable to him because of his failure to deny or explain this evidence."

6

The People contend appellant failed to explain why he ran from the scene of the second crash and did not go home for five days.  We do not agree.

Appellant did explain why he fled from the scene of the crash: he was in shock and was afraid the man in the black car was still pursuing him.  This is an explanation.  (See *People v. Kondor* (1988) 200 Cal.App.3d 52, 57 [CALJIC No. 262 unwarranted even if defendant's explanation seems improbable].)

The People do not explain why appellant's failure to return home for several days after the collision was relevant.  (See *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469 (*Lamer*) [CALJIC No. 2.62 applies when defendant fails " 'to explain or deny any fact of *evidence that was within the scope of relevant cross-examination.*' "].)  Appellant did testify clearly that he did not go home the day after the accident because he was contacting lawyers.  This is an explanation for that day.  As to subsequent days, the prosecutor's questions show that his theory of relevancy was that appellant was staying away from home to avoid the police.  When the prosecutor directly asked, "So, you're staying away from home because you know the police are going to be there?" Appellant responded, "No.  I just didn't want to go home." The "No" is clearly a denial.  While a denial may be more believable if accompanied by an explanation, CALJIC No. 2.62 requires either a denial *or* an explanation, not both.

Because there was no evidence which appellant failed to deny or explain, the trial court erred in giving CALJIC No. 2.62.  Although appellant criticizes CALJIC No. 2.62 on a number of legal grounds, the California Supreme Court has concluded "that CALJIC No. 2.62 suffers no constitutional or other infirmity." (*People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*)

7

[considering instruction substantially similar to the one given in this case].) Thus, we apply the harmless error standard adopted in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Saddler,* at p. 683; *Lamer, supra,* 110 Cal.App.4th at p. 1471.) Under that standard, a reviewing court asks whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson,* at p. 836.)

We note appellant has cited no cases finding reversible error for giving CALJIC No. 2.62. As the Fourth District Court of Appeal noted in *Lamer*, although "courts have frequently found giving CALJIC No. 2.62 to constitute error, we have not found a single case in which an appellate court found the error to be reversible under the *Watson* standard. On the contrary, courts have routinely found that the improper giving of CALJIC No. 2.62 constitutes harmless error. [Citations.]" (*Lamer*, *supra,* 110 Cal.App.4th at p. 1472.)

There are several good reasons for this. " 'CALJIC No. 2.62 does not direct the jury to draw an adverse inference. It applies only if the jury finds that the defendant failed to explain or deny evidence. It contains other portions favorable to the defense (suggesting when it would be unreasonable to draw the inference; and cautioning that the failure to deny or explain evidence does not create a presumption of guilt, or by itself warrant an inference of guilt, nor relieve the prosecution of the burden of proving every essential element of the crime beyond a reasonable doubt).' In addition, courts have noted that the fact that juries are instructed, pursuant to CALJIC No. 17.31, to 'disregard any instruction which applies to a state of facts which you determine does not exist,' also mitigates any prejudicial effect related to the

improper giving of CALJIC No. 2.62. (*Saddler, supra*, 24 Cal.3d at p. 684.)" (*Lamer, supra*, 110 Cal.App.4th at p. 1472.)

We see no reasonable probability of a more favorable outcome in this case either. Appellant contends that this was a close case because the jury asked for a readback of appellant's testimony and the definition of implied malice, and it deliberated for three days. Appellant acknowledges the facts concerning the fatal collision were undisputed, but contends a case may be close when the facts are undisputed but the inferences to be drawn from that evidence may conflict. Appellant appears to claim that the competing inferences here are whether he acted with implied malice or criminal negligence.

We do not agree that the length of the deliberations indicates a close case. The jury deliberated for about 5.5 hours total.[3] This is not a lengthy deliberation for a trial lasting six days and involving over 10 witnesses. (See *People v. Walker* (1995) 31 Cal.App.4th 432, 438, *People v. Houston* (2005) 130 Cal.App.4th 279, 301.) The fact that the jury requests readback of testimony does not necessarily establish the case was close. (See *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1075.) We also do not see how the request for a definition of "implied malice" and "malice aforethought" shows this was a close case. Implied malice was defined in the instruction on second degree murder, but the more general instruction defining murder used the term "malice aforethought" but did not define it. Thus, the jury's question is almost certainly related to this instructional gap, not the state of the evidence.

---

[3]     The jury deliberated for about 1.5 hours on the first day of deliberation, almost three hours on the second day and about an hour on the third and final day.

9

Appellant does not discuss the strength of the actual evidence at all. We find the prosecution's case to be very strong. It was undisputed that appellant drove at 80 to 85 miles per hour through a red light, hit the Honda Civic, and then fled the scene. Lopez, who was driving behind appellant, saw the red light. Video of the scene showed that no one was chasing appellant as he fled. In contrast, appellant's claim that he mistakenly focused on a closer green light and that he believed Lopez was chasing him at the scene of the second collision was unsupported by physical evidence.

In his reply brief, appellant contends the instruction singles out the defendant's testimony for special scrutiny and allows that jury to conclude "his testimony was untruthful if he failed to explain or deny 'any evidence against him.' " Our Supreme Court has rejected the claim that the instruction improperly singles out the defendant's testimony for scrutiny. (*Saddler, supra*, 24 Cal.3d at pp. 680–681.) Further, this is not a reasonable reading of the instruction, which is much more limited in scope and does not discuss a defendant's credibility at all.

Appellant next contends that the instruction required him to explain why he saw a green light, not a red light at the intersection where the fatal collision occurred, and "if he could not, then the jury could find he was lying."

The prosecution offered evidence the light was red for the direction in which appellant was driving and appellant drove through the red light into the intersection. The instruction would permit the jury to find this evidence true if appellant did not either deny the light was red or explain why he drove through the intersection against a red light. Appellant chose to explain: he

10

testified that he did not notice the red light, but instead was focused on a green light at the intersection before Avenue O-8, which he described as close to the Avenue O-8 intersection. We see nothing in the instruction which required more from appellant.

Appellant complains the instruction did not require the People to explain why appellant did not see a green light. This complaint is misplaced, as the California Supreme Court has explained. (*Saddler, supra,* 24 Cal.3d at pp. 680–681 [instruction is consistent with Evidence Code section 413 which applies to testifying parties, and "[s]ince the only testifying 'party' in a criminal case is the defendant, the code section can have reference only to him"].) Further, appellant's claim that the People did not have to explain why appellant did not see a green light is just an indirect way of saying that the People did not have to prove that appellant saw the red light. CALJIC No. 2.62 explicitly states that it does not relieve the People of their burden of proving every essential element of the charged crimes and the defendant's guilt beyond a reasonable doubt. How the People tried to meet that burden in light of appellant's green light claim was a matter of judgment and tactics.

B. *The Trial Court Did Not Abuse Its Discretion in Imposing Consecutive Sentences.*

Appellant acknowledges the trial court sentenced him consecutively for the count 1 and 2 murder convictions based at least in part on the fact that there were two victims, a proper basis for imposing consecutive terms. However, appellant contends the trial court abused its discretion because its decision was also based in part on appellant's lack of remorse during trial Appellant argues the record does not support the trial court's

11

recall of appellant's testimony or show that appellant had an opportunity to express remorse during trial and failed to do so.

We agree with the People that the trial court's comments make it clear the court selected consecutive terms solely because there were two victims. The trial court's comments about remorse were made as part of comments directed to the victims' families. The trial court then signaled a clear change of topic, telling the prosecutor and defense counsel that the court had the parties' sentencing memoranda and that there was one issue in the case: whether to sentence counts 1 and 2 concurrently or consecutively. The court then stated: "The court does not . . . think that one life is more important or less important than the other. There were two individuals. Two young individuals that had their lives in front of them and [the court] will not treat them the same in terms of sentencing. [¶] So it is this court's intention to sentence [appellant] consecutively."

Assuming for the sake of argument that the trial court also relied on appellant's lack of remorse, we would see no reasonable probability of a more favorable outcome if the trial court reconsidered its decision in light of an accurate record of appellant's testimony. The court stated: "[Appellant] took the stand in his own defense and he was asked a question, a very specific question about how did you feel the moment you impacted the victims' vehicle approximately 85 miles per hour? How did you feel? What was your first thought, was the question that was posed to him. What was your first thought? And that was really the moment [appellant] had the opportunity to say something remorseful. [¶] I should have—in retrospect I was afraid, but I should have gone to go check on those two kids or those two people in the car, but he didn't. And he was asked that

12

question twice by [the prosecutor], and on both occasions he said my first thought was to get a lawyer. [¶] It shows a complete and utter lack of remorse to this court based upon the trial testimony at your trial."

We agree with appellant that the trial court did not recall appellant's testimony with 100 percent accuracy, but the trial court's comments do capture the essence of appellant's testimony, which was that his first thought on learning that two people had died in the collision was that he needed to get a lawyer. This is a self-centered response. Even if appellant had been permitted to answer defense counsel's next question about how he felt,[4] and even if he had expressed some form of remorse, that would not change the fact that his first thought was not regret that his actions had resulted in two deaths, but that he needed to protect himself from any consequences of his actions. Remorse would thereafter ring hollow.

---

[4] As appellant notes, the trial court sustained an objection to defense counsel's question asking "How did you feel when you came to learn that the other two people in the other car had passed away?"

13

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

WILEY, J.

VIRAMONTES, J.

14